George WASHINGTON, et al.,
Plaintiffs,

v.

BROWN & WILLIAMSON TOBACCO
CORP., Defendant.

Civ. A. No. 80–114–3–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 13, 1991.

Mathis, Sands, Jordan & Adams, Charles A. Mathis, Jr., Brian G. Combs, Macon, Ga., for plaintiffs.

Steve Ralston, New York City, for plaintiff and intervenor NAACP Legal Defense Fund.

Frank C. Jones, King & Spalding, Atlanta, Ga., Buckner F. Melton, Joseph W. Popper, Jr., Sell & Melton, Macon, Ga., Richard A. Schneider, William A. Clineburg, Jr., L. Joseph Loveland, King & Spalding, Atlanta, Ga., for defendant.

OWENS, Chief Judge:

In this most difficult and well-tried dispute, the court is finally prepared to render

a decision on the merits of each of the named plaintiff's claims. Before making its final conclusions on the subject, however, the court believes it would be appropriate to detail the procedural history of this case in order to better explain the court's ruling today.

## Procedural History

This case was filed on June 23, 1980, by plaintiffs, George Washington and Edward P. Barnes, Sr. Their complaint was subsequently amended on July 22, 1980, by adding Cynthia Knight, Margie Andrews, and Pamela Tobler as plaintiffs to the complaint. In their action, plaintiffs sought relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981 for claims of employment discrimination allegedly committed by defendant Brown & Williamson Tobacco Corporation (B & W). They sought both individual and class-based relief. Plaintiffs also elected to have their claims arising under both Title VII and 42 U.S.C. § 1981 tried non-jury. Subsequent to the filing of their complaint, Mr. Donald Davis sought to intervene as a party-plaintiff. This court granted permissive intervention, pursuant to Rule 24(b) of the Federal Rules of Civil Procedure on August 26, 1983, after this court determined that Mr. Davis could rely upon the "single filing" rule enunciated by the Eleventh Circuit in *Ezell v. Mobile Housing Board,* 709 F.2d 1376 (11th Cir.1983). *See* Order of this court dated August 26, 1983. Defendant's motion to reconsider this permissive intervention decision was denied on May 6, 1985.

After limited discovery was completed, the court held an evidentiary hearing on September 24–25, 1984, to determine whether class certification was appropriate in this action. The court thereafter held that plaintiffs' evidence was insufficient to demonstrate the close nexus required to be shown before this court could certify a class or classes pursuant to Rule 23 of the Federal Rules of Civil Procedure. *See* Order of this court dated August 7, 1985, 106 F.R.D. 592.[1] The parties were then given ninety (90) days to complete any and all discovery relevant to proving the individual claims of discrimination. Following the passage of this time period, the court proceeded to hear the claims of each of the named plaintiffs in a non-jury trial held between December 15–17, 1986.[2] After hearing this evidence, the court is now prepared to render its opinion on the merits of plaintiffs' claims. Before discussing the claims of the individual plaintiffs, however, the court considers it important to again address the issue of whether Mr. Davis met the "single filing" requirement set out in *Ezell,* and further, to address the issue of whether plaintiffs were entitled to additional class-wide discovery to prove the individual claims once the court refused to certify a class.

## I. The Single–Filing Rule and Mr. Davis

While the court has already twice found that Mr. Davis could proceed in this action despite the fact that he had not previously filed a timely charge of racial discrimination with the EEOC, the court has discovered a new opinion from the Eleventh Circuit that casts doubt on the court's earlier decisions in this matter. In *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987), the Eleventh Circuit discussed the requirements for class certification in a Title VII action and also the elements needed to be proven before a plaintiff could utilize the "single-filing rule." Speaking about the "single-filing rule," the Court of Appeals held:

> This rule, which has become known as the "single-filing rule," contains two essential requirements: "First, at least one plaintiff must have timely filed an EEOC

---

1. *See also Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987); *Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1565–67 (11th Cir.1987); 2 A. Larson & L. Larson, *Employment Discrimination* § 49.52(c)(2) (1986) (while *Falcon* does not eliminate broad-based class actions *per se,* it will be a rare situation indeed that will permit the combining of hiring, promotion and discharge claims in the same class).

2. Plaintiff Margie Andrews was voluntarily dismissed without prejudice prior to this trial on the merits.

complaint that is not otherwise defective.... Second, the individual claims of the filing and non-filing plaintiffs must have arisen out of similar discriminatory treatment in the same time frame.

*Id.* at 1492. Applying this law to the facts of that case, the Eleventh Circuit found that the non-filing plaintiff (Smith) could not rely upon the filing plaintiff's (Griffin) charge to the EEOC because while Griffin had alleged in his complaint to the EEOC grievances concerning "sincerity of recruiting, hiring, and promoting of minority groups within the Florida's Division of Adult Corrections," Griffin had actually been hired, and, therefore, he only had standing to raise promotion and discipline claims. Furthermore, because Griffin complained of purely *subjective* promotional discipline practices and Smith complained of *objective* hiring practices, Smith could not avail himself of the exception found in footnote fifteen of the Supreme Court's decision in *General Telephone Co. v. Falcon,* 457 U.S. 147, 158–59 n. 15, 102 S.Ct. 2364, 2371 n. 15, 72 L.Ed.2d 740 (1982). In that case, the Supreme Court held that if the discrimination manifests itself in both hiring and promotion practices in the same general fashion, such as through entirely subjective decision-making processes, a class of plaintiffs complaining of both hiring and promotion practices may then be certified. Otherwise, applicants and incumbent employees cannot share the same class.

Now, in this case the court ruled that since Mr. Barnes had included in his EEOC complaint allegations relating to B & W's hiring policies, Mr. Davis was not required to file charges with the EEOC because Mr. Barnes' complaint adequately put B & W on notice of the alleged problems relating to its hiring practices. But since Mr. Barnes was actually employed by B & W, and thus did not have standing to object to B & W's hiring practices, the decision in *Griffin* says that Mr. Davis should have filed his own complaint with the EEOC. In addition, Mr. Davis cannot rely upon the

exception found in the *Falcon* decision because Mr. Barnes complains about the promotion and discipline procedures utilized by B & W, which is entirely different from the hiring procedure used by B & W when it rejected Mr. Davis.[3] Under these facts, *Griffin* mandates that Mr. Davis' Title VII claim be dismissed since he cannot avail himself of the *Ezell* "single-filing rule." His 42 U.S.C. § 1981 claims, however, stand on a different footing. Under that section, a plaintiff does not have to first file a complaint with the EEOC to satisfy a jurisdictional prerequisite to bring suit against an employer. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). Because the section 1981 claims are properly before the court, Mr. Davis' section 1981 claims will be decided at this time. The court will DISMISS Mr. Davis' Title VII claims though, because he has failed to demonstrate sufficient cause for his failure to file charges with the EEOC within the applicable time period.

## II. Class-wide Discovery to Demonstrate the Individual Claims

After this court refused to certify under Rule 23 the proposed class of plaintiffs, the individually-named plaintiffs were given ninety (90) days to complete any and all discovery relevant to their individual claims. *See* Order of this court dated May 8, 1986. During this period, plaintiffs sought, by way of more narrow discovery requests, data on the specific job classifications that they occupied and further sought information about similarly situated employees that were treated differently from themselves. Plaintiffs' counsel were clearly constrained from requesting information about class-type evidence by the court's orders of August 7, 1985, and May 8, 1986. Upon a further review of the relevant case law on this subject, however, the court *sua sponte* reached the conclusion that, while plaintiffs had not sufficiently demonstrated the required nexus between their claims

---

**3.** Mr. Davis was required to take both a written and informal test designed to evaluate his qualifications for the SFT–E position, whereas Mr. Barnes was evaluated on the basis of his performance.

and the claims of the proposed plaintiff class to warrant a Rule 23 certification order, plaintiffs were still entitled to the class-type data previously sought by them in order to prove the individual Title VII and 42 U.S.C. § 1981 claims.[4] Because statistical evidence and evidence of pattern discrimination might possibly be relevant in deciding the individual claims of race discrimination, this court reconsidered its previous discovery orders and on June 27, 1988, ordered B & W to permit discovery of the class-type evidence earlier sought by plaintiffs. After plaintiffs' expert had been given time to analyze this evidence, this material and his conclusions derived therefrom were introduced into the record. B & W was then given time to challenge plaintiffs' expert's testimony. Now that the parties have been provided with an opportunity to supplement the record with all additional facts considered relevant, the court is prepared to decide the merits of the individual claims.

III. The Individual Plaintiffs

■ Plaintiffs, with the exception of Mr. Davis, have both Title VII and 42 U.S.C. § 1981 claims of discrimination in employment. Under Title VII, plaintiffs allege that they were treated less favorably than their fellow workers because of their race. In an action brought by individual plaintiffs alleging discrimination in various facets of the employment process, *e.g.*, hiring, promotion, and termination, each plaintiff bears the burden of proving that each employment decision that adversely affected him/her was the product of a discriminatory motive. *See Perryman v. Johnson Products Co., Inc.*, 698 F.2d 1138, 1143 (11th Cir.1983).

■ In the case *sub judice*, plaintiffs have taken two approaches in proving their individual claims against B & W. First, plaintiffs have asserted that B & W engaged in a pattern and practice of discrimination, or that discrimination is B & W's standard operating procedure. In order to prove such allegations, plaintiffs must first "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure— the regular rather than the unusual practice." *See Griffin v. Carlin*, 755 F.2d at 1525 (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396. There can be no doubt that statistics can be relevant and important in an individual case. *Harris v. Birmingham Board of Education*, 712 F.2d 1377, 1383 (11th Cir. 1983).

However, the use to which such potentially critical statistical evidence is put may have far-reaching importance. Plaintiffs in the case *sub judice* do not seek to utilize the statistical data to prove that B & W's policies, otherwise fair in form, have a disparate impact upon B & W's workers. Nor is the case *sub judice* one proceeding forward on behalf of a class of plaintiffs. *See Washington v. Brown & Williamson Tobacco Corp.*, 106 F.R.D. 592 (M.D.Ga.1985); Order: Tab 88. Rather, plaintiffs offer statistical evidence which allegedly supports arguments that B & W has maintained a discriminatory pattern and practice in its decisions with regard to promotions within the company as evidence in support of their individual claims of disparate treatment.

Plaintiffs, through the use of the statistical data, argue that B & W regularly and *purposefully* treated blacks less favorably than whites. This alleged disparity in treatment involved B & W's alleged refusal to place representative numbers of black employees in managerial, primary technical, craft worker, salaried, and group leader positions and B & W's failure to compensate the few blacks who were employed in these positions at levels comparably to the wages paid to white employees at the same levels. Plaintiffs' expert, Dr. Shapiro, com-

---

4. For example, if plaintiffs could show that B & W maintained a pattern and practice of discrimination, *i.e.*, that race "discrimination was the company's standard operating procedure," a *prima facie* case of disparate treatment would be shown. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); and *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985).

piled a statistical report reflective of plaintiffs' arguments concerning the alleged disparity in opportunities afforded black and white employees at B & W.

■ The importance of pointing out that the court is presented with issues of individual discrimination as opposed to class discrimination or disparate impact is clear when one considers the legal importance assigned to statistical data with regard to individual claims under Title VII. While plaintiffs may offer statistics evidencing that an employer engages in a pattern or practice of intentional discrimination in support of claims of individual discrimination, *see Parker v. Burnley*, 693 F.Supp. 1138, 1153 (N.D.Ga.1988), "statistics alone cannot make a case of individual disparate treatment." *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984). Even if a pattern of discrimination is borne out by the statistics, each individual must nonetheless show that he or she was the victim of an identifiable act of discrimination. *Id.* at 1132.

■ The significance of this rule of law is most easily understood when one compares the standard to that in Title VII actions proceeding on behalf of a class of plaintiffs. A case of class-wide discrimination may be made out by a proper representative by compelling, independent evidence of a pattern or practice of discrimination; "in an individual case 'each plaintiff bears the burden of proving that each employment decision that adversely affected him or her was the product of a discriminatory motive.'" *Id.* (quoting *Perryman v. Johnson Products Co.*, 698 F.2d 1138 (11th Cir.1983). Thus, even if the plaintiffs in the case *sub judice* succeed in proving that a pattern of discrimination exists or existed at B & W, each individual plaintiff will yet be called upon to prove that he or she suffered from an adverse employment decision which evidenced discrimination. *See Hill v. Metropolitan Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1541 (11th Cir. 1988), modified on other grounds, 848 F.2d 1522 (11th Cir.1988), ("regardless of which method of proof a plaintiff uses, he must point to a job that he was denied because of his race") (citation omitted).

■ The court first addresses each plaintiff's individual Title VII as governed by the elements set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this approach, plaintiffs must establish a *prima facie* case of discrimination,[5] the employer must then come forward with evidence of legitimate, non-discriminatory reasons for its

---

**5.** A plaintiff may establish a *prima facie* case of hiring discrimination by proving (1) that he or she belongs to a protected minority, (2) that he or she applied for and was qualified for a job for which the employer was seeking applicants, (3) that, despite these qualifications, he or she was rejected, and (4) that, after the rejection, the employer continued to seek applications from persons with similar qualifications. *See Perryman*, 698 F.2d at 1141 n. 6. A *prima facie* case of discrimination in termination is established where the plaintiff proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained. *Id.* at 1141–42. A plaintiff may establish a prima facie case of promotion discrimination by proving that he or she is a member of a protected minority, was qualified for and applied for the promotion, was rejected despite these qualifications, and that other employees with equal or lesser qualifications who were not members of the protected minority were promoted. *Id.* at 1142 n. 7. Finally, a plaintiff may establish a prima facie case of retaliatory discharge by proving that he or she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding, was disadvantaged by an action of the employer simultaneously with or subsequent to such opposition or participation, and that there is a causal connection between the protected activity and the adverse employment action. *Id.* at 1142 n. 8. Statistical disparities, which are insufficient to demonstrate a pattern and practice of discrimination, might still be relevant in making out a *prima facie* case or in proving pretext. *See Carmichael*, 738 F.2d at 1131; *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 832–33 (8th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); and *Talley v. United States Postal Service*, 720 F.2d 505, 507–08 (8th Cir.), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984).

actions, and if the defendant creates a factual question on this issue, plaintiffs must prove that these articulated reasons are a pretext for intentional discrimination. Should plaintiffs fail to produce evidence of discrimination with regard to their individual claims, any statistical evidence of an alleged pattern or practice of discrimination would fall short of meeting the evidentiary standard in this individual claims case. *See Powers v. Alabama Dept. of Educ.*, 854 F.2d 1285, 1291 (11th Cir.1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989) (credible statistical evidence standing alone is an insufficient basis on which to find discriminatory intent).

 Briefly, with respect to plaintiffs' 42 U.S.C. § 1981 claims, this section clearly affords plaintiffs a federal remedy against discrimination in private employment on the basis of race. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975). In order to prevail on these claims, plaintiffs must show purposeful discrimination on the part of B & W. *See General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Generally, the legal elements of a section 1981 claim are identical to those of a Title VII disparate treatment claim, and, therefore, analysis under one theory is usually determinative of the other claim. *See Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir.1985); and *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n. 6 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). With these initial considerations stated, the court now proceeds to the claims of the individual plaintiffs.

## A. *George Washington*

Plaintiff George Washington is a black male who resides in Houston County, Georgia. He was hired by B & W to work at its Macon plant in September, 1975, as a group leader in the Primary Department. The Primary Department is the section of the plant where tobacco is processed, blended, and treated before being forwarded to the Fabrication Department to be made into various brands of cigarettes. The position of "Group Leader" is a salaried supervisory position. As a Group Leader, Mr. Washington was a first line supervisor responsible for supervising the activities of his assigned group of hourly employees. *See* Transcript of Hearing dated September 24–25, 1984, Vol. 1, pp. 86, 89–91, 142–145. In addition to the Primary Department and Fabrication Department, there are numerous other departments and areas in B & W's Macon plant, but since none of the five plaintiffs ever worked in these other departments or areas, the functioning of these other areas is not relevant to the court's inquiry today. The court's focus will, therefore, be on the Primary and Fabrication Departments.

The Primary Department is divided into six areas: (1) Storages; (2) Conditioning and Blending; (3) Cutting and Drying; (4) the WTS area; (5) Menthol; and (6) Reclaim. Storages is responsible for overseeing the storage of tobacco in the plant's warehouse. The Conditioning and Blending area is the area where moisture is added to tobacco and various kinds of tobacco are blended together. The WTS area is where leaf stems are treated before being blended into other tobaccos. The Cutting and Drying area is where tobacco is cut and dried for shipment to Fabrication. The Menthol area is the area where menthol is added to tobacco for the subsequent production of menthol cigarettes. Finally, the Reclaim area is the area where defectively manufactured cigarettes are broken down, with the tobacco in them being "reclaimed" for subsequent re-use in production. *Id.* at pp. 145, 163, 181, 191, 208–09.

Mr. Washington was one of five group leaders initially hired by B & W to work in the Primary Department. B & W started these five employees to work before actual cigarette production was to begin in January of 1977, so that by the time production was scheduled to begin, it was hoped that these group leaders would be familiar with the work areas that they were charged with supervising. *Id.* at 179; and Tran-

script of Evidentiary hearing held between December 15–17, 1986, at pp. 25–26.

As training supervisor for the Primary Department, Mr. Herbert G. Prizer was plaintiff Washington's supervisor during his initial period of employment. After this training period ended, Mr. Prizer continued to have supervisory duties over Mr. Washington. Mr. Lowell W. Mayhall, Primary Manager at B & W and Mr. Prizer's immediate supervisor, was also given the task of supervising Mr. Washington's performance. See Transcript of Evidentiary Hearing held on September 24–25, 1984, Vol. 1, at pp. 93–94; and Transcript of Evidentiary Hearing held on December 15–17, 1986, at pp. 24–26, 140. Both of these men testified about Mr. Washington's job performance while at B & W.

Plaintiff Washington and the four other original group leaders were trained by engaging in the kind of work that would later be done by their hourly subordinates. This training took place in the warehouse storage area, which was the only part of the plant that was operational at the time. Later on this training was discontinued because of problems with the warehouse roof. Mr. Washington and three other group leaders [6] were thereafter transferred to the Power House, where they were trained as Boiler Operators. While on this job assignment, Mr. Washington was required to work a double shift one day a week during the three-month period that he was temporarily assigned to that job. Plaintiff Washington alleges that Margo Hutcheson, a white female group leader in Primary, was taken off similar duty when she protested, but that he was not similarly relieved of the double shift duty because of his race. See Transcript of Evidentiary Hearing held on September 24–25, 1984, Vol. 1, at pp. 96–104, 180–81; and Transcript of Evidentiary Hearing held on December 15–17, 1986, at pp. 26–27. Plaintiff Washington has presented no evidence, other than his own conclusory remarks, to support this claim of disparate treatment.

In fact, when questioned further about this incident, Mr. Washington was unable to refute B & W's position that black and white employees outside of the Primary were also required to work sixteen (16) hours in a row. Nor did Ms. Hutcheson testify about her involvement in this incident. Absent such evidence, Mr. Washington's disparate treatment claim surrounding this double-shift work requirement must fail since he simply has failed to persuade the court that B & W selected him for this duty because of his race.

B & W continued to train Mr. Washington for much of 1976, in preparation for when the plant could begin full production. Throughout this training period, Mr. Prizer had various concerns about Mr. Washington's performance and his inability to stay in the area to which he was assigned. Mr. Prizer disapproved of this conduct and cautioned Mr. Washington about it. See Transcript of Evidentiary Hearing dated September 24–25, 1984, Vol. 1, at pp. 104–06, 156; Transcript of Evidentiary Hearing dated December 15–17, 1986, at pp. 29–30, 34, 40–41; and Defendant's Exhibit 112.

After cigarette production began in January of 1977, plaintiff Washington remained in charge of the Menthol area. Plaintiff Edward Barnes was assigned to Reclaim at this time. Despite the fact that Mr. Washington and Mr. Barnes were separated by a central corridor that was over 200 feet long, Mr. Washington and Mr. Barnes were continually seen together. Mr. Prizer confronted plaintiff Barnes and plaintiff Washington about this problem. Mr. Washington testified that Mr. Prizer said that anytime he saw "two blacks" together, 90% of the time they were goofing off. Mr. Barnes also testified that this statement was made. Mr. Washington, however, contemporaneously recorded Mr. Prizer's statements, and in his notes, Mr. Washington wrote: "He [Mr. Prizer] also said that he just felt like when we were together that 90% of the time we were just goofing off and he would not like to see us there.

6. Mr. Barnes remained in the warehouse area during this time working on interim assignment

together so much." Mr. Washington later altered this memo by striking "we" and inserting "two blacks" on the memo. The court finds, as a matter of fact, that Mr. Prizer's statement to Mr. Washington and Mr. Barnes did not include the language "two blacks." This conclusion is supported by a second contemporaneous memo prepared by Mr. Washington in which he again summarized Mr. Prizer's comments, but yet made no mention of any "two blacks" language used by Mr. Prizer. Mr. Barnes' and Mr. Washington's testimony on this subject is simply not credible. *See* Transcript of Evidentiary Hearing held September 24–25, 1984, Vol. 1, at pp. 120, 124; Transcript of Evidentiary Hearing held on December 15–17, 1986, at pp. 40–42, 441, 449; and Defendant's Exhibits 112, 29 and 31.

On August 22, 1977, Mr. Prizer issued a memorandum to all Primary Group leaders instructing them not to leave their work areas without prior permission from either Mr. Mayhall or Mr. Prizer. While this memorandum was prompted somewhat by the conduct of Mr. Barnes and Mr. Washington, the court finds that its primary purpose was to insure that all Primary Group leaders be in their appropriate stations at all times so that these supervisors could deal with problems encountered by their employees. While Mr. Barnes and Mr. Washington both testified that they saw other Primary Group leaders out of their work areas, they presented no evidence that these persons did not have permission, and called none of these other Group Leaders. Mr. Prizer also testified that he authorized all Group Leaders to leave their work areas so long as they had a valid reason to leave, and that this policy was applied evenhandedly. The court credits Mr. Prizer's testimony and also finds that Mr. Washington simply did not prove these allegations of disparate treatment by sufficient evidence.

 Mr. Washington also alleges that the performance appraisals he received

from his supervisors were done in a discriminatory manner. In December, 1977, Mr. Washington's first appraisal rated him "competent." [7] The only primary group leader shown to have a higher rating was Mr. Barnes, who had a "commendable" rating. Mr. Washington's second performance appraisal was issued on November 17, 1978. He was rated "adequate" at this time. This rating was based upon the fact that he had performed at a "competent" level in Menthol, but that he was performing at a "provisional" level in Conditioning and Blending. The court finds that these ratings were not given in a discriminatory manner, but were based on his poor job performance, which included the following incidents:

(1) While working in the Conditioning and Blending area, Mr. Washington had more average down time per day than any other group leader assigned to supervise that area;

(2) On August 28, 1978, because of an unattended wash valve on a holding tank, Mr. Washington's area produced a batch of casing solution that had too much water mixed into it;

(3) On October 23, 1978, the first shift in the blending area under Mr. Washington's supervision produced an incorrect formulation of Turkish tobacco. This occurred despite the fact that Mr. Washington had earlier received verbal and written instructions on the proper formulation;

(4) On December 6, 1978, Mr. Washington failed to attend a meeting for all members of the Primary management and failed to present a reasonable excuse for his non-attendance;

(5) From January 3, 1979, until he was terminated on February 12, 1979, Mr. Washington was cited for various errors that occurred in his department. These errors included problems with an air screen, improper use of the John Mohr moisturizing unit and improper blending of casing solution. Mr. Washington also continued to have problems with staying in his

7. The rating scale was "Distinguished", "Commendable", "Competent", "Adequate" and "Provisional." Defendant's Exhibit 56.

work area and with carrying out instructions given by his supervisors.

Other allegations of discriminatory treatment made by Mr. Washington include: (1) that he was transferred to the Conditioning and Blending Department without training in the hopes that his performance problems would increase; (2) that other white Group Leaders in the Conditioning and Blending area had made similar mistakes but that they were not similarly reprimanded; and (3) that he had been denied a promotion awarded to Group Leader Betty Smith in February of 1979 because of his race. The evidence presented to this court, however, shows that: (1) Mr. Washington did receive the same amount of training as other white Group Leaders; (2) that the mistakes made by other white Group Leaders neither were as serious nor did they continue as long as those in the case of Mr. Washington; and, (3) that Ms. Smith had more experience and less performance problems than Mr. Washington, and, therefore, she was simply a better candidate for the promotion. Plaintiff Washington presented no direct evidence to refute these conclusions. His case was based solely upon his conclusory allegations of discrimination. In fact, Mr. Washington asserts that his supervised employees conspired to have him fired and purposely caused mistakes to carry out that plan. The court refuses to find such a situation under these facts. Rather, it was Mr. Washington's inability to properly supervise his employees that ultimately led to his termination. B & W did not discriminate against him on the basis of race, nor did they retaliate against him for his filing of complaints with the EEOC. This court must, therefore, conclude that Mr. Washington has not carried his burden under *McDonnell Douglas* and *Burdine* in showing discrimination based upon race, and thus, he has no claims under Title VII or 42 U.S.C. § 1981.

## B. *Edward P. Barnes*

Plaintiff Edward P. Barnes was employed at B & W's Macon plant from 1975 to early 1983. Like Mr. Washington, Mr. Barnes was employed as Group Leader in the Primary Department and was supervised by Mr. Prizer and Mr. Mayhall during his initial periods of employment. Once the Macon plant began operations, because of his accounting background Mr. Barnes was placed in charge of the Storages area of the Primary Department. The Storages area is responsible for keeping track of the containers of tobacco sent to the plant. Mr. Barnes contends that he was assigned this job because other white Group Leaders expressed an interest in not being assigned to that area. He has presented no evidence to refute B & W's reason for placing him there, and, therefore, the court does not find his allegation in this regard to be supported by the facts.

Mr. Barnes received his first performance appraisal on January 15, 1976. He received a rating of "satisfactory." Mr. Prizer testified that he believed this appraisal was positive. Mr. Barnes contends that it should have been higher, yet he does not show that any of the other white Group Leaders got higher ratings. The court does not find this appraisal discriminatory.

After the storage area was repaired and the initial group of hourly employees arrived, Mr. Barnes was appointed as the forklift safety instructor for the Macon plant. Despite his training for this position, in late 1975 or early 1976, Mr. Barnes, by improperly operating it, overturned a forklift truck causing the unit to be damaged and nearly causing severe personal injury. On October 6, 1977, Mr. Barnes had a second accident involving a forklift. In this incident, Mr. Barnes used the forks of a forklift to raise himself. This was contrary to the plant's safety rules, which required the use of a protective cage to insure that arms, legs or other items not get caught in the forklift's lifting mechanisms. Mr. Barnes' hand was caught in the mechanism and crushed. He was out from work for approximately one month as a result of this incident.

In August, 1976, Mr. Barnes was involved in an accident while operating one of the company's motor bikes. The acci-

dent involved a collision with a dump truck that was being operated by the construction company hired to construct the B & W plant. When asked by Mr. Prizer how the accident occurred, Mr. Barnes admitted that he was going around the curve too fast and was unable to stop when he came upon the truck. Mr. Barnes later filed a lawsuit against the construction company. Mr. Prizer was disturbed by the fact that Mr. Barnes would bring a lawsuit despite his own admission that he had caused the incident. Mr. Prizer recommended that Mr. Barnes be discharged; however, Mr. Mayhall and the Branch Manager chose not to follow Mr. Prizer's recommendation. The Personnel Department also instructed Mr. Prizer not to allow his feelings about the motor bike incident to influence Mr. Barnes' upcoming appraisal, which was given on May 25, 1977. In this appraisal, Mr. Prizer rated Mr. Barnes' job performance as "commendable," which was one notch below the top rating of "distinguished."

█ Mr. Barnes contends that he was passed over for promotion to the position of Shift Supervisor in August of 1977, in favor of Reagan Hardy (white), because of his race. The facts presented to the court demonstrate that Mr. Prizer did recommend Mr. Hardy for the promotion in question, and that when Mr. Prizer made this recommendation, Mr. Prizer had earlier voiced his concerns about Mr. Barnes' conduct concerning the motor bike. Even if the court were to assume that this latter fact was the reason why Mr. Barnes was passed over for promotion, such unfairness does not demonstrate discrimination based upon race. Furthermore, Mr. Barnes failed to show that he was, in fact, better qualified than Mr. Hardy because he presented virtually no evidence on Mr. Hardy's qualifications.

While Mr. Barnes was out of work due to his accident with the forklift, Mr. Prizer became responsible for supervising Mr. Barnes' Storages area. During this time, Mr. Prizer discovered that Mr. Barnes' area was in a general disarray, with tobacco improperly stored, operating procedures violated, hourly people in the area upset about the operation of the warehouse, and inventory records out of date. An audit by Arthur Young & Associates in 1977 confirmed the generally poor condition the department was in at that time. Based upon this poor performance, Mr. Barnes was reassigned to Reclaim, an area which he had successfully managed before.

Once in the Reclaim area, Mr. Barnes was asked to immediately improve his performance in housekeeping, material location, coordination of the flow of materials, and was required to familiarize himself with the operation of that department. Due to the difficulty Mr. Prizer had in communicating with Mr. Barnes, Mr. Prizer issued a memorandum to him detailing his duties and the way in which the area was to be operated. Like Mr. Washington, Mr. Barnes also had a habit of leaving his work area without a business-related justification. His performance, while not terrible, was less than that desired by B & W from its employees. In addition there were incidents in which Mr. Barnes failed to obey direct orders of his supervisors.[8]

Mr. Barnes received another performance appraisal on January 3, 1979. He was given an "adequate" rating in this evaluation, primarily because of his problems in the areas of productivity, housekeeping and safety. Mr. Barnes filed an EEOC charge complaining of his second evaluation and also that he had been restricted to his work area in retaliation for filing his first EEOC charge. The court finds that the facts presented by Mr. Barnes do not demonstrate that this appraisal was low because of his race or because of his assertion of rights under Title VII. Furthermore, the court has heard the evidence concerning the policy which requires employees to stay in their work areas, and for

---

**8.** For example, on one occasion he was told by his supervisor to get some spilled tobacco off the floor in the Reclaim area. Mr. Prizer also told Mr. Barnes to get the tobacco removed, yet, one hour after having been so instructed, the tobacco remained on the floor of the Reclaim area (Transcript of hearing held between December 15–17, 1986, at pp. 84–85; and Defendant's Exhibit 10).

the same reasons stated by the court in Mr. Washington's case, the court finds that Mr. Barnes has not met his burden of showing that this policy was applied in a discriminatory manner.

■ Mr. Barnes also complains about the manner in which he was transferred through a number of the areas in the Primary Department. The court finds that the transfers made in his case were intended to help, not hinder, Mr. Barnes' performance. For example, after a relatively poor appraisal in the Reclaim area, Mr. Prizer subsequently transferred Mr. Barnes back to the Storages area in 1979. It was hoped that Mr. Barnes' prior experience in that area would allow him to succeed. This area was supervised by a black supervisor, Mr. Joe White. Mr. Barnes remained in Storages from 1979 until February, 1980, and was rated "competent." He was thereafter transferred to the Menthol Department.

■ While in the Menthol Department, Mr. Barnes was supervised by Mr. H.D. Sorrell. Mr. Sorrell testified to numerous incidents in which Mr. Barnes appeared to abandon his responsibility of properly supervising and training his hourly employees. *See* Transcript of hearing held between December 15–17, 1986, at pp. 152–153; and Defendant's Exhibit 161. Mr. John Crews, a black Fabrication Manager at the Macon plant, had a similar experience with Mr. Barnes and his performance. *See* Transcript of hearing held between December 15–17, 1986, at pp. 418–420.

In 1982, Mr. Barnes was reassigned to the Cutting and Drying area, which is responsible for feeding tobacco directly to the Fabrication Department to be processed into the final cigarette product. During this period, Mr. Barnes was responsible for numerous and repeated production problems in the Fabrication area, that resulted in direct losses of production and earnings. It was at this time also that certain union officials accused Mr. Barnes of sexually harassing one of the female employees assigned to his area. These union officials asked that Mr. Barnes be dis-

charged; however, B & W refused to take that type of action at that time.

Mr. Barnes received his next performance appraisal on March 23, 1982. This appraisal covered his performance in the Menthol area and the Cutting and Drying area. He was given an overall rating of "adequate," which indicated that he was not performing his job requirements. Management informed him that he needed to make drastic and lasting improvements in the quality of work that he was doing. Based upon the facts stated above, B & W was justified in giving Mr. Barnes such an appraisal.

■ Following this appraisal and until Mr. Barnes was ultimately discharged on January 5, 1983, Mr. Barnes' performance dramatically deteriorated. Among the incidents that led to his dismissal were:

(1) In July of 1982, Mr. Barnes failed to prevent and later report the improper blending of over 6,000 pounds of tobacco (Transcript of hearing held between December 15–17, 1986, at pp. 154–155; and Defendant's Exhibit 20);

(2) On August 12, 1982, Mr. Sorrell again raised his concern about seeing employees standing around and talking to each other instead of working (Transcript of hearing held between December 15–17, 1986, at pp. 157–160; and Defendant's Exhibit 22);

(3) On September 1, 1982, Mr. Barnes' failure to monitor a tobacco drying machine in his area caused a shutdown of 24 cigarette making machines in the Fabrication Department (Transcript of hearing held between December 24–25, 1984, at pp. 237–38; Defendant's Exhibit 23 (Transcript of hearing held between December 15–17, 1986, at pp. 178–181); and

(4) On November 23, 1982, Mr. Barnes failed to make an accurate inventory accounting, and on December 9, 1982, Mr. Barnes failed to properly manage an emergency involving the tobacco conveyors (Barnes Deposition II, pp. 67–70; Defendant's Exhibit 24).

As a result of these incidents, a final decision was reached in late 1982 to discharge Mr. Barnes. Management at B &

W delayed his discharge, however, until January of 1983 to insure Mr. Barnes' eligibility for 1982 profit sharing, vacation pay and bonuses.

While Mr. Barnes claims that his discharge was discriminatory and in retaliation for his bringing of charges with the EEOC, the court finds that Mr. Barnes simply was not performing up to the level required by all employees at B & W. Rather than accept this fact, Mr. Barnes chose to blame his problems on race discrimination. The court finds, however, that he has failed to demonstrate that similar non-protected class members were treated anymore favorably than he was, and thus, Mr. Barnes has not met his burden under Title VII or 42 U.S.C. § 1981 to prove discrimination based upon race.

### C. *Cynthia D. Knight*

■ Cynthia D. Knight was first employed by B & W on January 1, 1977, as a Fabrication Technician. On February 14, 1978, she was promoted to the position of Group Leader in the Fabrication Department, and she continues to hold that position. The Fabrication Department is responsible for making and packaging cigarettes. Ms. Knight asserts that she has been passed over for promotion at B & W because of her race. While Ms. Knight has never filed an EEOC charge with regard to these claims, the court finds that she may utilize the *Ezell* "single-filing rule" because, like Mr. Barnes and Mr. Washington, her claims stem from B & W's use of its supervisory appraisal system.

During the period between 1978 and 1985, Ms. Knight received eight performance appraisals. Mr. Luther Blalock (white), the Fabrication Shift Supervisor, appraised her on three separate occasions. In 1978, he appraised her as "commendable" (Transcript of hearing held between December 15–17, 1986, at pp. 230–32; and Defendant's Exhibit 64). In June of 1980, Mr. Blalock appraised her as "competent" (Transcript of hearing held between De-

cember 15–17, 1986, at p. 234; and Defendant's Exhibit 68). While this report was lower than her first appraisal, it contained positive comments about her performance. Finally, in 1981, Mr. Blalock rated Ms. Knight as "commendable" (Transcript of hearing held between December 15–17, 1986, at p. 235; and Defendant's Exhibit 69). Before this last appraisal was done in 1981, Mr. Blalock had submitted a salary increase recommendation for plaintiff Knight. Mr. Blalock recommended that she be given a merit increase in line with a "commendable" rating, rather than an increase in line with her existing rating of "competent." The court heard evidence, however, that this recommendation was rejected by Fabrication Manager John Crews (black), because her 1981 appraisal had not been written at that time and Mr. Blalock could not justify a rating of "commendable" for the interim period. The court credits this testimony and finds that race did not play a part in this salary decision.

■ From 1982 through April, 1986, Freddie McLaurin (black) acted as a Shift Supervisor in the Fabrication Department at the Macon plant. He was assigned the task of supervising a number of employees, including Ms. Knight. Mr. McLaurin was, in turn, supervised by Herb Prizer and John Crews. Mr. McLaurin appraised Ms. Knight on December 21, 1984 (Transcript of hearing held between December 15–17, 1986, at pp. 206–07; and Defendant's Exhibit 65). He rated her overall performance as "meets requirements." [9] Ms. Knight claims that this 1984 appraisal was discriminatory. Ms. Knight, however, has presented no facts that would allow the court to find that the problems detailed in this appraisal were either not true or exaggerated. In addition, she has not presented any evidence of other Group Leaders performing similarly who were given any higher ratings than she was given. Without this evidence the court is unpersuaded that her black supervisor was discrimina-

---

9. Brown and Williamson's performance rating scale was by then expanded to include "Distinguished", "Commendable", "Highly Effective", "Meets Requirements", "Adequate", and "Provisional." (See Defendant's Exhibit 65). Compare n. 7, *supra.*

ting against her on account of her race when she was given this appraisal.

Again it appears to the court that, like Mr. Barnes, Ms. Knight is unable to accept the fact that her ratings depend a large part upon the performance of her subordinates. While it is true that the individual conduct of her supervised employees is not always controllable, the court can accept the fact that it is a supervisor's duty to minimize mistakes from his/her employees, and that capable supervisors can do just that. The performance appraisals done by B & W on Ms. Knight reflect this philosophy. Such an ideal is prohibited by neither Title VII nor 42 U.S.C. § 1981, and it certainly does not demonstrate on its own, race discrimination.

■■■ With respect to the various promotions Ms. Knight claims she was refused because of her race, the court finds the following facts to be proven:

(1) After being promoted to Group Leader, Ms. Knight asserts that she was passed over for the position of Buyer, which was ultimately filled by Johnny Mixon, a white employee at B & W. The court heard evidence, however, that Mr. Mixon had worked as a purchasing agent at Denbuilt Corporation for three years, that he had approximately three and one-half years experience as an estimator, and that he had worked in B & W's Parts Department, where he was required to use purchase orders, requisition invoices, and bills of lading. This experience made him a more qualified candidate for the position of Buyer than Ms. Knight, and, therefore, B & W was within its right to hire him for that position (Transcript of hearing held between September 24–25, 1984, Vol. 1, at pp. 55–57, 78–84; Transcript of hearing held between December 15–17, 1986, at p. 344–45' and Defendant's Exhibit 180);

(2) Ms. Knight also contends that she should have been moved to the position of Safety Coordinator instead of Robert McKinley. Mr. McKinley was recommended for this position by Mr. Crews. Mr. Crews has stated in a sworn affidavit that he found Mr. McKinley to have the ability to manage his own affairs. He also

has stated that Ms. Knight's race played no part in his decision to recommend Mr. McKinley for the safety position. The court finds Mr. Crews' testimony to be credible. Furthermore, Ms. Knight has presented no evidence to rebut Mr. McKinley's qualifications as stated. The court, therefore, finds that Mr. McKinley was better qualified for the position of Safety Coordinator than Ms. Knight (Affidavit of John A. Crews, Jr., attached as Exhibit A to Defendant's Post-trial Findings of Fact and Conclusions of Law); and

(3) Ms. Knight claims that she should have been selected as the Assistant to the Shift Supervisor in administering the Fabrication Department. The evidence presented shows that the Assistant selected was a white employee, Mr. Earl Hamilton. This selection was made by Supervisor McLaurin. Plaintiff has presented no evidence, however, of Mr. Hamilton's qualifications. Mr. McLaurin has testified about his concerns with Ms. Knight's ability to deal with her subordinates, and no evidence has been presented that Mr. Hamilton had similar problems or other factors that would make him less qualified. In other words, Ms. Knight simply has not met her burden of showing that she was as qualified as the person ultimately picked for the position, and that her non-selection was due to her race.

Finally, in order to prove her promotional claims, Ms. Knight presented evidence that B & W at one point refused to pay the cost of certain courses she was taking at a local college, despite the fact that B & W had paid for those same classes for other white employees, and also that she was denied access to certain training courses at B & W solely because of her race. She contends that this conduct on the part of B & W shows a discriminatory *animus* with regard to her employment relationship. The court does not accept this conclusion given the fact that ultimately B & W paid for her college courses voluntarily, and further, that the training courses that she complained about not being offered, were eventually offered and taken by her (Defendant's Exhibit 65; and Transcript of hear-

ing dated December 15–17, 1986, at p. 210). Based upon these findings, the court must conclude that she has not met her burden under *McDonnell Douglas* and *Burdine* of showing that B & W failed to promote her because of her race. The court concludes that there is no basis for relief under either Title VII or 42 U.S.C. § 1981.

### D. *Pamela K. Tobler*

██ Plaintiff Pamela K. Tobler is currently employed at B & W's Macon plant as a Fabrication Technician. She was first hired as a Fabrication Technician on June 18, 1978. Her sole claim in this case is that the decision to discharge her on May 2, 1980, which was ultimately rescinded in part by way of arbitration, was discriminatory. The evidence presented to the court on this issue was as follows:

(1) Ms. Tobler was informed on the day she started work at B & W that she was expressly prohibited from leaving the job, plant, or work area without express permission of supervision (Transcript of hearing held between December 15–17, 1986, at p. 386; and Defendant's Exhibit 80);

(2) During her employment, Ms. Tobler began to have problems with being absent, late, and leaving the plant early. On September 2, 1979, she was counseled about being absent eight times, late once, and leaving early three times since January of that year (Transcript of hearing held between December 15–17, 1986, at p. 388; and Defendant's Exhibit 96);

(3) On January 31, 1980, she was counseled again for being absent four times, leaving early twice, and for being late once during the period between September 2, 1979, and January 31, 1980. Noted by Ms. Tobler's supervisor was the statement:

> Pam acknowledged the problem she was causing, and stated she would improve. I stated to Pam this problem could lead to her jeopardizing her job. I also told her the next offense would be documented as a written warning to go in her personnel file and could lead to her

being terminated if a great improvement is not shown.

(Transcript of hearing held between December 15–17, 1986, at p. 389; and Defendant's Exhibit 97);

(4) On April 9, 1980, Ms. Tobler was given a performance evaluation, which included counseling her about her attendance problem (Transcript of hearing held between December 15–17, 1986, at pp. 391–92; and Defendant's Exhibit 98);

(5) On April 29, 1980, Ms. Tobler approached her supervisor, Ken Parker, and told him that she was not feeling well. She asked for permission to go to the nurse, which was given at that time. After talking to the nurse, Ms. Green, Ms. Tobler went home without notifying her supervisor.

(6) On the following day, Ms. Tobler was asked by plant management, Mr. Richard W. Clifton, why she left the plant without permission. She told him that Nurse Green had given her permission to leave. Nurse Green denied that she had given such permission. Mr. Clifton, after considering Ms. Tobler's knowledge of the procedures used by B & W with regard to leaving the plant, concluded that Ms. Tobler knew she did not have authorization to leave when she left on April 29, 1980. The evidence showed that Ms. Tobler had visited the plant nurse on numerous occasions, that on eight of those occasions the nurse recommended that Ms. Tobler go home, and that on each of those eight occasions Ms. Tobler returned to her area and received her supervisor's permission to leave (Transcript of hearing held between September 24–25, 1984, Vol. 2, at pp. 6–16; Transcript of hearing held between December 15–17, 1986, at pp. 384–399, Defendant's Exhibit 94; and Defendant's Exhibit 100).

(7) Based upon this conduct, B & W discharged Ms. Tobler on May 2, 1980;

(8) Ms. Tobler filed a grievance concerning her discharge, and that grievance was arbitrated.[10] No claim of race discrimina-

---

10. The Fabrication Technicians at the B & W Macon plant are unionized, and consequently,

Ms. Tobler was represented by the Bakery, Confectionery and Tobacco Workers International

tion was alleged in this grievance. The arbitrator found that "[t]here is no question that [Ms. Tobler] knew she had to have [express permission of supervision before leaving the plant] because she testified to this effect." The arbitrator concluded, however, that other black employees at B & W had been treated more favorably for similar conduct, and, therefore, the arbitrator reduced Ms. Tobler's discharge to a thirty (30) working day suspension without pay. Ms. Tobler was subsequently reinstated with back pay, less pay for the thirty-day suspension imposed by the arbitrator (Transcript of hearing held between September 24–25, 1984, Vol. 2 at pp. 14–17; Transcript of hearing held between December 15–17, 1986, at pp. 399–400; and Defendant's Exhibit 84).

After hearing this evidence the court must conclude that the basis for Ms. Tobler's discharge on May 2, 1980, was her continued attendance problem, and more specifically, her flagrant failure to notify her supervisor on April 29, 1980, that she was leaving the plant. The court recognizes that B & W has a need for its workers to be on time, to stay the entire shift, and when this is not possible, for the employees to inform management that they must leave so that B & W can take measures to fill the vacancy while the employee is absent. This court has heard the testimony of Mr. Clifton, and finds his statement that his decision to discharge Ms. Tobler was not motivated by race, to be credible. Ms. Tobler has failed to present any evidence that white employees at B & W have been treated more favorably for similar conduct, and, therefore, she also has failed to demonstrate a claim based upon either Title VII or 42 U.S.C. § 1981.[11]

E. *Donald Davis*

■ Plaintiff Donald Davis intervened in this action in 1983. He asserts that B & W discriminated against him on account of his race when B & W did not hire him for the position of Electrical/Electronic Technician in 1981. An Electrical/Electronic Technician (otherwise known as an SFT–E) is responsible for the installation, preventive maintenance, and repair of equipment located in the Fabrication Department of the plant. The evidence presented to the court showed that in November of 1980, there were openings at B & W in the SFT–E positions. In filling these positions, B & W was looking for persons that had substantial experience in both electronics and electrical work. This was because the equipment at the plant was diversified, with some equipment being mostly electronic, while other equipment being mostly electrical. B & W was, therefore, looking for persons who had experience to install, service and repair this diversified equipment. Furthermore, B & W had found from past experience that normally only persons with an industrial or related background maintained the skills needed for the SFT–E position.

In addition, B & W had also found in the past that it was nearly impossible to find qualified persons from the Macon area to fill the SFT–E position. B & W, however, in November of 1980, decided to try again. An advertisement was run in the Macon Telegraph stating that B & W was interested in hiring persons that had experience with 480 volt and 3 PH motors, industrial control systems, digital logic systems, and test equipment, such as oscilloscopes, VOM, etc. The job also required a thorough familiarity with DC motor controllers.

Mr. Davis, along with 80 other applicants, applied for the available positions. Mr. Davis had recently retired from the United States Air Force, after serving twenty-one years. While in the Air Force, he had worked for the first several years as an aircraft mechanic and spent several years as an instructor in the field of mechanics. Later, he sought training in radar

---

Union, Local 362–T (Transcript of hearing held between September 24–25, 1984, Vol. 2, at pp. 13–14; and Defendant's Exhibit 84).

11. While Ms. Tobler has never filed an EEOC charge, the court believes that her complaint with regard to the subjective manner in which she was discharged, is encompassed by the complaints filed by Mr. Barnes and Mr. Washington, and thus, she also is entitled to utilize the *Ezell* "single-filing rule."

repair. He worked on radar equipment and radar electronics during the period when the Air Force was transistorizing its equipment. He continued to work as a radar repairman in various locations until 1975, when he became a supervisor of employees who were maintaining electronic components. He remained in this position until he retired. Mr. Davis had also done some part-time work outside of the Air Force repairing televisions, stereos and depth finders.

The application process used by B & W began by having the eighty applicants come to the plant, where they were invited to listen to an informational session during which the responsibilities of the SFT–E job were discussed. Applicants were also advised that they must be qualified to perform the SFT–E job without any training, that only an orientation or familiarization program would be utilized. During this informational session, applicants who continued to express an interest in the job were then given an opportunity to submit an application form and to take a test designed to give B & W an idea of the applicant's basic knowledge of electrical and electronic symbols, elements and activities. This test required the drawing of certain digital logic gates, the completion of electronic "truth tables" associated with each gate, the completion of an electrical diagram, the drawing of electrical symbols for several basic components, and the completion of a basic electrical troubleshooting exercise. Once the test had been finished, the applicants were told that B & W would contact them at a later date if they were to be interviewed for the positions. Mr. Ronald E. Young, the Electrical Manager of the Fabrication Department, testified that applicants were selected for interviews on the basis of the results of this test, their written applications and a review of their work experience.

Following the taking of this test, Mr. Young reviewed Mr. Davis' test results. He concluded from these results that Mr. Davis probably had very little experience with the National Electric Code, three-phase motor controllers, and that he had an inability to draw symbols for a light-emit-

ting diode, an SCR, or a Triac, all of which are used in connection with DC and AC motor controllers. Despite these concerns, however, Mr. Young sought to give Mr. Davis the benefit of the doubt and asked him to come back for an interview. The Manager of Personnel Administration, Tommy Brown, arranged for an interview in early February of 1981. After arriving, Mr. Davis met with Mr. Brown, Mr. Young and Mr. Tom Gibson, an Electrical Maintenance Supervisor at B & W. After interviewing with Mr. Brown and Mr. Young, Mr. Gibson took Mr. Davis on a tour of the equipment he would be required to service. Mr. Davis was asked to identify various parts of the equipment shown, and to describe how he would go about troubleshooting the equipment. Following this tour, Mr. Gibson discussed Mr. Davis' performance with Mr. Young. Both Mr. Young and Mr. Gibson concluded that Mr. Davis was very limited in industrial experience, and lacked experience with DC motor controllers, frequency inverters and industrial programmable controllers. Based upon this conclusion the decision was made not to hire Mr. Davis for the SFT–E position.

The court notes initially that Mr. Davis' complaint in intervention was filed on March 28, 1983. B & W's failure to hire Mr. Davis occurred in February of 1981. It, thus, appears that any wage claims that Mr. Davis might have had are barred by the applicable two (2) year limitations period. *See Mack v. W. R. Grace Co.*, 578 F.Supp. 626, 635–36 (N.D.Ga.1983), *cert. denied*, 469 U.S. 805, 105 S.Ct. 62, 83 L.Ed.2d 13 (1984). Of course, he still can pursue injunctive and declaratory relief, which has an applicable twenty (20) year limitations period. *Id.* In order to be entitled to this relief, however, he must still show purposeful discrimination on the part of B & W. After reviewing the evidence presented, the court concludes that Mr. Davis has not shown purposeful racial discrimination on the part of B & W when it refused to hire him for the SFT–E position. B & W allowed him to go further in the interviewing process than was warranted only because of its genuine concern with

hiring qualified minority applicants. B & W does not have a duty under section 1981 to train minority applicants so that they can fill available positions; rather, it only has a duty to not reject qualified applicants on the basis of race. Mr. Davis was simply not qualified in Young and Gibson's opinion for the SFT–E job.

Mr. Davis attempted to show that a white employee with similar credentials had been hired by B & W, thus, proving disparate treatment. The evidence on this point was that a Mr. George Snipes, who had a similar background and experience as Mr. Davis, was hired in 1978, but that he was discharged in July of 1978 because of his inability to perform troubleshooting tasks. When Mr. Davis, in 1980, applied at B & W, ten white individuals with backgrounds similar to Mr. Davis' background also applied for SFT–E positions at B & W. They too were summarily rejected by B & W. This evidence fails to prove purposeful discrimination on the part of B & W. Accordingly, the court must conclude that Mr. Davis has failed to prove his claim of discrimination under 42 U.S.C. § 1981.

## IV. Evidence of Statistical Disparity

At the hearings held between September 24–25, 1984, plaintiffs presented to the court the testimony of Dr. Martin Shapiro. Dr. Shapiro, an expert in evaluating statistics in employment discrimination matters, was called upon to review certain information provided to him through discovery from B & W. After making his initial conclusions, the court allowed plaintiffs to seek from B & W additional statistics that might be relevant in proving a pattern and practice of discrimination at B & W. Dr. Shapiro thereafter made his conclusions based upon the discovery material that had been provided to him earlier and also this new evidence, and filed a report with this court on February 23, 1990. B & W presented rebuttal evidence to this testimony.

As the court noted earlier, statistical data enjoys a limited role in an individual Title VII case such as the case *sub judice*. Even if these types of statistics were of some greater evidentiary import to the court at this stage of the analysis, plaintiffs themselves bring into question whether the specific statistics offered here could have any direct impact upon the merits of the individual claims. Plaintiffs state that they do not represent that their statistics and their expert's accompanying report purport to be evidence about specific practices and their impact. Instead, plaintiffs continue:

> It [the statistical report] is ... more evidence of what Dr. Shapiro testified to as **unexplained, under-representation of blacks,** compared to their expected availability from the representation in other parts of the work force.

(Plaintiffs' Argument in Support of Expert's Report: Tab 115) (emphasis added). Ironically, plaintiffs themselves appear to suggest the propriety of the limited influence afforded statistical data in disputes in individual Title VII claims.

The case law in this area echoes these sentiments as to the limited importance of statistical data in this area. Briefly, because the plaintiffs have failed to demonstrate that any of their individual claims alleging direct acts of discrimination on the part of B & W, the statistical evidence, no matter how compelling, cannot salvage their individual claims. *See Powers*, 854 F.2d at 1291. Accordingly, the court hereby finds that even if the proffered statistical evidence were to establish a pattern and practice of discrimination at B & W, the failure of the individual plaintiffs to demonstrate that they specifically, individually suffered an adverse employment decision rooted in discriminatory motives renders the statistical evidence insufficient to support the plaintiffs' individual Title VII claims. *See Carmichael*, 738 F.2d at 1131.[12]

---

**12.** Given that a statistical showing of a pattern or practice of discrimination would not, as a matter of settled law, salvage the plaintiffs' claims, the court declines to consider whether the statistics establish such a pattern.

Finally, plaintiffs have attempted to show that the evaluation methods used at B & W are discriminatory because they are not sufficiently based upon objective factors. In the case of Mr. Davis, the employment decision not to hire him was made on the basis of objective written and informal testing developed to indicate the applicant's knowledge of electronic and mechanical apparatus, as well as subjective hiring criteria. Plaintiffs have failed to show that these tests have a disparate impact on black applicants, and further, defendants have shown that the tests have a "manifest and legitimate and business relationship to the jobs for which the tests were used." *See Cormier v. P.P.G. Industries, Inc.*, 702 F.2d 567, 568 (5th Cir.1983).

With respect to the other named plaintiffs, B & W's evaluation process utilizes objective job-performance information compiled by the employee's supervisors. To some extent the process is inherently subjective; however, plaintiffs have not shown that this process was applied in an uneven manner or that similarly qualified non-minority employees were being rated higher under this same evaluation process. Plaintiffs had an opportunity to request the evaluations and pay rates of other employees occupying the same job categories as the named plaintiffs, but have presented no evidence to support these contentions. Without such evidence, their claims that the evaluation process is being applied discriminatorily cannot be proven. Furthermore, the use of subjective criteria in making employment decisions when the jobs are supervisory in nature is not *per se* impermissible. *See Schlei & Grossman, Employment Discrimination Law* 2d Ed., 1987 Supp. at 32. It simply must be used fairly and uniformly with a safeguarded procedure. *See Pouncy v. Prudential Insurance Company of America*, 668 F.2d 795 (5th Cir.1982) (safeguards found by district court included meaningful instructions for evaluations, upper-level review of evaluations, and opportunity for each employee to review evaluation). B & W's evaluation process contains all of these safeguards. In other words, plaintiffs have simply failed to meet their burden of proving that the employment practices at B & W were applied in a discriminatory manner.

### Conclusions

This court finds that while plaintiff Davis was unable to allege a claim based upon Title VII, due to his failure to file timely charges with the EEOC, he was able to assert claims based upon 42 U.S.C. § 1981. After reviewing these claims and the claims of the other named plaintiffs brought pursuant to both Title VII and 42 U.S.C. § 1981, the court has found that they have failed to carry their burden of proof in demonstrating that B & W discriminated against them on account of their race; plaintiffs failed to prove any disparate treatment. Accordingly, plaintiffs' claims against B & W must be DENIED for failure to prove intentional discrimination on the part of B & W. Let judgment be entered in favor of defendant.

SO ORDERED.