**Clement I. MOMAH, M.D.**

v.

**ALBERT EINSTEIN MEDICAL CENTER, Sze–Ya Yeh, M.D., Individually, Jeffrey Levy, M.D., Individually and Old York Road Ob/Gyn Associates, P.C.**

**Civil Action No. 94–CV–7043.**

United States District Court,
E.D. Pennsylvania.

Oct. 7, 1997.

Willan Franklyn Joseph, Philadelphia, PA, for Plaintiff.

Hope A. Comisky, Linda, J. Karpel, Anderson, Kill, Olick & Oshinsky, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

This civil action has been brought before the Court on Defendants' Motion for Summary Judgment. Following careful consideration of the record and for the reasons set forth in the following paragraphs, we conclude that summary judgment is appropriately entered in defendants' favor on all of plaintiff's claims.

### HISTORY OF THE CASE

In June, 1992 Plaintiff, who is a black man of nigerian national origin, was hired by the Albert Einstein Medical Center as a third year resident in the Department of Obstetrics and Gynecology. (Plaintiff's Amended Complaint, ¶ 11; Defendants' Amended Answer, ¶ 11). Plaintiff contends that "at least since the Spring of 1993" until he was finally terminated on August 24, 1993, he was subjected to discriminatory treatment and a hostile environment at the defendant medical center and was harassed and excessively and unnecessarily criticized by the medical center staff, including Defendants Levy and Yeh and other resident doctors. (Amended Complaint, ¶ s 22–25, 28–28).

Plaintiff also avers that defendants defamed him and that he was treated differently than other residents who were outside the protected race and of different national origin. According to Plaintiff, he received disparate treatment and was eventually terminated because of his race and national origin and because he opposed defendants' unlawful unemployment practices. Plaintiff brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.*, 42 U.S.C. § 1981, the Pennsylvania Human Relations Act, 43 P.S. § 951, *et. seq.*, and Pennsylvania common law. (Amended Complaint, ¶ s 2, 53, 57–65, 71).

In answer to the Amended Complaint, Defendants deny making any defamatory statements about the plaintiff and submit that Dr. Momah was terminated solely for performance-based reasons, unrelated to his race, national origin or in retaliation for opposition to impermissible employment practices. Upon completion of discovery, defendants filed this motion to dismiss for lack of jurisdiction and for summary judgment on March 22, 1996.

On June 18, 1996, plaintiff's Title VII claims were remanded to the Equal Employment Opportunity Commission ("EEOC") for investigation and attempted conciliation and the matter was placed in suspense status pending the outcome of the conciliation proceedings or passage of 180 days, whichever was sooner. Thereafter, on February 24, 1997, this case was removed from suspense and defendants' motion for summary judgment was renewed.

As plaintiff has now apparently exhausted his administrative remedies, that portion of defendants' motion which seeks dismissal on the basis of insufficient jurisdiction shall be denied as moot. *See, e.g.: Brown v. General Services Administration,* 425 U.S. 820, 832, 96 S.Ct. 1961, 1967, 48 L.Ed.2d 402 (1976); *Schanzer v. Rutgers University,* 934 F.Supp. 669, 673 (D.N.J.1996); *Burton v. Great Western Steel Company,* 833 F.Supp. 1266, 1269 (N.D.Ill.1993). This motion shall therefore be treated solely as one for summary judgment.

### STANDARDS GOVERNING ENTRY OF SUMMARY JUDGMENT

The legal standards and principles to be followed by the district courts in resolving motions for summary judgment are clearly set forth in Fed.R.Civ.P. 56. Subsection (c) of that rule states, in pertinent part,

... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

In this way, a motion for summary judgment requires the court to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty*

*Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C.Cir.1988), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). *See Also: Aries Realty, Inc. v. AGS Columbia Associates*, 751 F.Supp. 444 (S.D.N.Y.1990).

As a general rule, the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a summary judgment motion, the court must view the facts in the light most favorable to the party opposing the motion and all reasonable inferences from the facts must be drawn in favor of that party as well. *U.S. v. Kensington Hospital*, 760 F.Supp. 1120 (E.D.Pa. 1991); *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. 1169 (E.D.Pa. 1990).

When, however, "a motion for summary judgment is made and supported [by affidavits or otherwise], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate may be entered against [it]." Fed.R.Civ.P. 56(e).

A material fact has been defined as one which might affect the outcome of the suit under relevant substantive law. *Boykin v. Bloomsburg University of Pennsylvania*, 893 F.Supp. 378, 393 (M.D.Pa.1995) citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*, citing *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

*DISCUSSION*

In Counts I and II of his amended complaint, Plaintiff contends that Defendants violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et. seq.* Count III seeks relief under 42 U.S.C. § 1981 and Counts IV through VII allege common law claims for defamation, breach of contract and under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et. seq.*

## 1. *Plaintiff's Discrimination Claims under Title VII and the PHRA*

Title VII, 42 U.S.C. § 2000e, renders it an unlawful employment practice for an employer to, among other things, discharge or otherwise discriminate against an individual with respect to his compensation, terms, conditions or privileges of employment or to limit, segregate or classify its employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect that individual because of his or her race, color, religion, sex or national origin. 42 U.S.C. § 2000e–2(a).

"Employer" for Title VII purposes is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such a person." 42 U.S.C. § 2000e(b). The law in this Circuit is now clear that individual employees cannot be held liable under Title VII. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1077–78 (3rd Cir.1996); *DeJoy v. Comcast Cable Communications, Inc.*, 941 F.Supp. 468, 474 (D.N.J.1996). *Also see, Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542 (3rd Cir.1996) and *Ascolese v. Southeastern Pennsylvania Transportation Auth.*, 902 F.Supp. 533 (E.D.Pa. 1995). Accordingly, as defendants Levi and Yeh cannot be held liable under Title VII, judgment in their favor shall be entered as a matter of law.[1]

---

1. Furthermore, to be held liable under Title VII an employer must have fifteen or more employees. 42 U.S.C. § 2000e(b). As the uncontradicted evidence here shows that plaintiff was never hired, fired or controlled by Old York Road Ob/ Gyn Associates and that this defendant never employed more than seven employees at a given time, summary judgment in favor of this defendant shall also be entered. (Defendants' Exhibit "H").

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.[2] Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment decision. *Id.,* 411 U.S. at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. 411 U.S. at 804, 93 S.Ct. at 1825.

The Court first clarified the nature of these shifting burdens in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and more recently in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In *Burdine,* the Supreme Court observed that "[w]hen the plaintiff has proved a prima facie case of discrimination, the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." 450 U.S. at 260, 101 S.Ct. at 1097. Throughout, however, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.,* 450 U.S. at 253, 101 S.Ct. at 1093.

In *Hicks,* the Supreme Court again revisited the issue of proof in Title VII cases as there was confusion in the Circuits over whether a plaintiff would be entitled to the entry of judgment if a defendant failed to adduce any evidence to rebut a plaintiff's showing that the defendant's proffered reasons for its employment decision were pretextual. In that case, the Court of Appeals for the Eighth Circuit had reasoned that "[b]ecause all of defendants' proffered reasons were discredited, defendants were in a position of having offered no legitimate reason for their actions ... [and] were in no better position than if they had remained silent, offering no rebuttal to an established inference that they had unlawfully discriminated against plaintiff on the basis of his race." *Id.,* 509 U.S. at 509, 113 S.Ct. at 2748, (quoting from Circuit Court opinion at 970 F.2d at 492).

In reversing the Circuit Court's reversal of the district court and its entry of judgment in the plaintiff's favor, the Supreme Court emphasized that under the *McDonnell Douglas* scheme, establishment of the prima face case in effect creates a presumption that the employer unlawfully discriminated against the employee and thereby places upon the defendant the burden of producing an explanation to rebut the prima facie case. It does not shift the ultimate burden of proof to the defendant. 509 U.S. at 506–07, 113 S.Ct. at 2747.

In short, once the defendant has met its burden of producing a non-discriminatory explanation for the employment action, the presumption created by the prima facie case dissolves and the trier of fact must proceed to decide the ultimate issue in the case: whether plaintiff has proved that defendant intentionally discriminated against him on the basis of his race. In making this determination, the factfinder may disbelieve the reasons put forth by defendant. While this disbelief may permit an award to be made in plaintiff's favor, it does not compel it. *See: Id.,* 509 U.S. at 511, 113 S.Ct. at 2749. ["The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may together with the elements of the

---

**2.** A prima facie case is established when a plaintiff has successfully shown (1) that he or she is a member of a protected class, and (2) is qualified for the position but (3) was either not hired or fired from that position (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur where the position is ultimately filled by a person not of the protected class. *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1066, note 5 (3rd Cir.1996); *Waldron v. SL Industries Inc.,* 56 F.3d 491, 491 (3rd Cir.1995), (both citing *McDonnell Douglas* and *Burdine* ).

prima facie case, suffice to show intentional discrimination."]

The *Hicks* decision did not entirely end the inquiry however, as both the courts and litigants continued to struggle with the question of what nature and quantum of evidence was necessary to permit a jury to find that an employer engaged in unlawful employment discrimination and for a plaintiff to surmount a motion for judgment as a matter of law.

In the intervening years since Hicks was decided, the Third Circuit has wrestled with these questions on a number of occasions. *See, Waldron v. SL Industries, supra; Miller v. CIGNA Corp.,* 47 F.3d 586 (3rd Cir. 1995); *Sempier v. Johnson & Higgins,* 45 F.3d 724 (3rd Cir.1995); *Fuentes v. Perskie,* 32 F.3d 759 (3rd Cir.1994). Most recently, in reversing the district court's entry of judgment as a matter of law for the defendant-employer in *Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061 (3rd Cir. 1996), the Third Circuit observed it was still the jury which must determine whether the inference of discrimination is warranted by assessing the weight of the evidence and the credibility of the witnesses. However, the Court reasoned,

> This does not mean that the courts in discrimination cases lose their traditional obligation, when faced with a motion for judgment as a matter of law, to review the adequacy of the showing presented to the factfinder. The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible.... The non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them worthy of credence .... (citations omitted) But once the court is satisfied that the evidence meets the threshold requirements, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination

drawn from an unbelievable reason proffered by the employer.

*Sheridan,* 100 F.3d at 1072.

As with Title VII, the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") prohibits discrimination in employment on the basis of race or national origin 43 P.S. § 955(a). "Employer" is likewise defined in the PHRA as "... any person employing four or more persons within the Commonwealth ..." 43 P.S. § 954(b). Generally, the PHRA is applied in accordance with Title VII and, like Title VII, the definition of employer under the PHRA cannot be construed to include employees as only employers may be held liable. *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542, 552 (3rd Cir.1996). Neither Title VII nor the PHRA is designed to protect the overly sensitive plaintiff. *Stewart v. Weis Markets, Inc.,* 890 F.Supp. 382, 389 (M.D.Pa. 1995).

Applying these principles to the matter before us, we note that plaintiff has met his burden of showing that he is a member of a protected class as he is an african-american of nigerian national origin. (Plaintiff's Amended Complaint, ¶ 4 and Defendants' Answer, ¶ 4). It further appears that plaintiff was qualified for the position of third-year resident physician as he had been hired for the job approximately one year prior to his termination and his one-year contract was renewed in March, 1993 (effective July 1, 1993). (Defendants' Exhibit "C" to Motion for Summary Judgment, ¶ 2,4; Defendants' Exhibit "D," 39, 56; Plaintiff's Exhibit 15 and Exhibit 27 at p. 43 to Opposition to Motion for Summary Judgment). It is also clear that plaintiff was discharged on August 24, 1993. (Defendants' Exhibit "D," ¶s21–22).

As to the fourth element, while we find that there is sufficient evidence on the record that plaintiff's discharge occurred under circumstances that give rise to an inference of unlawful discrimination such as to establish a prima facie case, it is scant.

It has long been recognized that Title VII may be violated not only by obvious, intentional acts of discrimination but also by em-

ployment policies or practices that are neutral on their face and in intent but which nevertheless discriminate in effect against a particular group. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977). A violation of Title VII can thus be shown in two separate and distinct ways: under either a disparate impact or disparate treatment theory. A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion. *E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, 346, 347 (3rd Cir. 1990), citing *International Brotherhood, supra*, 431 U.S. at 335–36, 97 S.Ct. at 1854–55. Unlike the discriminatory impact theory, proof of the employer's discriminatory motive is critical and can be shown through either direct or circumstantial evidence. *Id.* A plaintiff may therefore establish the fourth element of the prima facie case by showing that non-members of the protected class were treated more favorably than he or she was. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3rd Cir.1993); *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 522 (3rd Cir.1992), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

Plaintiff contends that he was treated differently from the other resident physicians employed by AEMC in that while his actions resulted in discipline or threats of discipline, similar action was not taken against other residents. Plaintiff further avers that the defendants did nothing to investigate or address plaintiff's reports of harassing, discriminatory and defamatory behavior by others toward him. (Amended Complaint, ¶ s18–19, 26–29).

It is defendant's position that Dr. Momah was terminated from his residency for his repeated refusal to follow directions and orders from his supervisors and attending physicians, his repeated failures to report to rounds on time, to be prepared for presentations, to respond when paged, for failing to complete medical records on time and for various deficiencies in patient care.

The record reflects that in the period between July, 1992 and August, 1993, seven of the residents in Einstein's program were of foreign national origin, seven were black (five african-americans and two africans), and the remaining eight residents were white americans. (Defendants' Exhibit "A," at pp. 32–33; Defendants' Exhibit "C," ¶ s 8, 27; Defendants' Exhibit "I," at p. 7, 27).

The record further reveals that of these other residents, defendants received complaints from the medical records department about chronically late and incomplete records from three of them in addition to the plaintiff. (Plaintiff's Exhibits 16, 18, 19). One of these other residents was an african-american female, the other two were white american males. (Plaintiff's Exhibits 18, 19). Each of these residents received the same letters of warning from Drs. Yeh and Levy that plaintiff received. (Plaintiff's Exhibits 16, 18 and 19). The african-american female resident was eventually placed on probationary status and eventually threatened with indefinite suspension when her records delinquencies continued even after the warning letters. (Plaintiff's Exhibit 18; Defendant's Exhibit "C," ¶ 24). In the face of the threat of indefinite suspension, that resident then completed her overdue reports and was thereafter responsive to warning letters. She was not suspended or terminated. (Defendant's Exhibit "C," ¶ 24). This evidence is insufficient to establish disparate treatment.

However, plaintiff has also produced evidence that defendants received complaints of arrogant behavior and insensitivity to patients regarding two other residents (both white americans). (Plaintiff's Exhibits 1, 16, 17, 23, 26, 27). One of these two residents was the subject of additional complaints from the nursing staff and attending physicians regarding her responsiveness to pages, chronic delinquencies in completing medical records on time, the quality of patient care she was rendering, in knowing and understanding her limitations and in following orders from superiors. (Plaintiff's Exhibit 16; Exhibit 26 at pp. 173–176; Exhibit 27 at pp. 75–78). While it appears as though some disciplinary action was taken against this res-

ident, the exact nature and extent of that action is unclear. (Plaintiff's Exhibit 16; Plaintiff's Exhibit 27 at pp. 79–83).

As for the other resident, both he and Dr. Momah were placed on probation for the duration of their residencies for arguing with one another during rounds and in front of patients and staff. However, as that resident graduated one year ahead of plaintiff, his probationary period was considerably shorter than Dr. Momah's. (Plaintiff's Exhibits 1 and 11; Plaintiff's Exhibit 23, pp. 103–104; Plaintiff's Exhibit 26 at pp. 177–189; Plaintiff's Exhibit 27 at pp. 89–90, 93–97). In view of this evidence then, we conclude that plaintiff has made a sufficient showing of disparate treatment to make out a prima facie case of unlawful discrimination.

We next review defendants' evidence to determine whether the reasons which they have articulated for Dr. Momah's termination are legitimate and are sufficient to rebut the inference of discrimination created by plaintiff's establishment of a prima facie case. Here, the record shows that while plaintiff received consistently favorable evaluations on his fund of medical knowledge, he likewise consistently received low marks in the areas of patient care, sensitivity, maturity, reliability and in his ability to develop cooperative relationships with other residents, attending physicians and nurses. (Plaintiff's Exhibit 10). In addition, the evidence shows that the directors of Einstein's residency program received numerous complaints from attending physicians, nurses, patients and other residents about the quality of care, attentiveness and sensitivity which Dr. Momah was showing toward patients, his responsiveness to calls and pages, and his lateness to morning rounds. (Plaintiff's Exhibits 21, 22, 24).

The record further reflects that, upon being apprised of these complaints, either Dr. Levy or Dr. Yeh or both of them discussed the complaints and problems with Dr. Momah and advised him of what he had to do to correct these problems. (Plaintiff's Exhibits 5, 7, 9–11, 14, 21–24, 28–30, 33–40, 42–44; Plaintiff's Exhibit 26, 75–92, 93–96, 118–124, 126–128, 131; Exhibit 27, 52, 54–66; Defendants' Exhibit "J"). The problems did not abate and the complaints continued with the result that on June 16, 1993, Dr. Yeh informed plaintiff that he was terminated from the residency program. (Plaintiff's Exhibit 26, at pp. 103–105, 111–139; Plaintiff's Exhibit 27, at pp. 56, 61–67; Plaintiff's Exhibits 29–34).

Pursuant to the hospital's internal policies, plaintiff received a fair hearing before a three-member panel of doctors the following day. This panel recommended and the department of obstetrics and gynecology agreed, that plaintiff's suspension would be set aside and he would be placed on strict probation contingent on satisfaction of certain conditions outlined in a letter from Dr. Levy. (Plaintiff's Exhibits 3, 5, 25, 26 at pp. 103–108, 140–141, 27 at pp. 123–125, 133–137; Exhibit 35).[3]

The record however, reflects that plaintiff did not satisfy the terms and conditions of his probation and he was therefore finally terminated on August 24, 1993. (Plaintiff's Exhibits 4, 7–9, 14, 26, 27, 36–39, 43–44; Defendants' Exhibits "B," "C," "E,"). Although Dr. Momah again requested and received a fair hearing before another three-member panel, his August 24, 1993 termination was upheld. (Defendants' Exhibit "F").

■ In view of all of this evidence, we find that defendants have sufficiently shown that they had legitimate, non-discriminatory reasons for terminating Dr. Momah from his residency. Accordingly, we now evaluate the record to determine whether the plaintiff has cast sufficient doubt upon the defendant's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible and that the true reason behind

3. Specifically, plaintiff was told to become more responsive and attentive to patient needs, to respond to calls and/or pages in a timely fashion, to arrive at all required meetings on time and to be prepared for presentations. Plaintiff was also informed that no further argumentative or disruptive behavior would be tolerated and that he was to work cooperatively with both peer and attending physicians and nurses. Finally plaintiff was to contact Dr. Levy's office and arrange for meetings with Dr. Levy at least twice a month to review and discuss his progress. Psychological counseling was recommended. (Plaintiff's Exhibit 35).

his termination was discrimination. *Sheridan, supra,* at 1072.

On this point, there is virtually no evidence other than the plaintiff's own testimony. In his deposition, plaintiff himself testified that he believed Dr. Levy acted preferentially to white residents in approving their vacation times and making other residents such as plaintiff cover up for any time off that these residents wanted. Plaintiff also testified that Dr. Levy treated the black residents as though they didn't count. (Defendant's Exhibit "A," 111–114).

Dr. Paul Neumann similarly testified that in connection with his evaluation of plaintiff's rotation at Chestnut Hill Hospital in late 1992, Dr. Momah advised that he believed the criticisms leveled against him from the nurses, other residents and attendings at that hospital were racially motivated. (Defendants' Exhibit "J," 28, 73–75). Dr. Neumann did not inform Dr. Levy, Dr. Yeh or anyone else at Einstein of Dr. Momah's allegations. (Defendants' Exhibit "J," 76–77) Although both Drs. Levy and Yeh acknowledged that Plaintiff had complained about several of the other residents, they did not remember that plaintiff's complaint involved a claim of racial discrimination. (Plaintiff's Exhibit 26, 173–177; Plaintiff's Exhibit 27, 79–86).

It is well settled that the plaintiff's own belief or feeling that he was the victim of disparate treatment is insufficient, standing alone, to preclude judgment as a matter of law. *Arzate v. City of Topeka,* 884 F.Supp. 1494, 1501 (D.Kan.1995), *citing, inter alia, Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1426 (10th Cir.1993). We therefore cannot find that this evidence, without more, is sufficient to sustain plaintiff's necessary burden of proof.

The only other evidence on this record to substantiate plaintiff's claim of racial and/or national origin discrimination is contained in an Affidavit from one Carol Thomas, a secretary to one of the hospital staff physicians, that she overheard one of the residents about whom plaintiff complained say that plaintiff was a "male chauvinist" and that he just "came out of Africa" so his attitude was to be expected. (Plaintiff's Exhibit 1, ¶ 8).

As a general rule, before an employer may be held liable for the discriminatory actions of a non-supervisory employee, it must be shown that it knew or should have known of the employee's discriminatory conduct and failed to take appropriate remedial action. *See: Codrington v. Virgin Islands Port Authority,* 911 F.Supp. 907, 911 (D.Virgin Islands 1996), citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1486 (3rd Cir.1990); *Valadez v. Uncle Julio's of Illinois, Inc.,* 895 F.Supp. 1008, 1015 (N.D.Ill.1995).

Here, viewing plaintiff's evidence in the most favorable light possible and accepting as true that the above-described statements were made, the resident about whose comments plaintiff complains was in the residency class *behind* plaintiff and had no managerial or supervisory responsibilities or powers over him. (Plaintiff's Exhibits 16, 26, at 173–179, 27, at 74–87). There is no evidence that these remarks were made more than one time or that defendants had any knowledge of them having been made at all prior to the commencement of this lawsuit. Indeed, none of the notes or minutes from any of Dr. Momah's Fair Hearings suggest that he believed that the motivation behind his termination was racial or nationality-based animus. (Plaintiff's Exhibits 3, 5, 25).

In light of all of the foregoing, this Court cannot find that plaintiff has cast sufficient doubt upon his employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible. Again, the mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient to survive summary judgment. There must be evidence on which the jury could reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 252, 106 S.Ct. at 2512. As plaintiff does not have sufficient evidence to prove that defendants terminated his residency because of his race or national origin, summary judgment will be entered in defendants' favor on Counts I and VI of plaintiff's amended complaint.

### 2. *Plaintiff's Claims of Retaliatory Discharge under Title VII and the PHRA*

■ In Counts II and VII of his amended complaint, plaintiff additionally claims that

his discharge was in retaliation for his opposition to defendants' unlawful employment practices, including discriminatory treatment in violation of both Title VII and the PHRA.

Under 42 U.S.C. § 2000e–3(a), it is an unlawful employment practice for an employer to discriminate against an employee for opposing, reporting or participating in an investigation into an unlawful employment practice.

The PHRA similarly declares it unlawful "[f]or any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 P.S. § 955(d).

The controlling standards for retaliatory discharge cases are quite plain. Under both statutes, to establish a prima facie case, a plaintiff must show (1) that he engaged in a protected activity; (2) that he was discharged subsequent to or contemporaneously with such activity; and (3) that a causal link exists between the protected activity and the discharge. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3rd Cir.1997); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3rd Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Consumers Motor Mart v. Human Relations Comm'n*, 108 Pa.Cmwlth. 59, 529 A.2d 571, 575 (1987). Thereafter, the order and allocation of burdens of proof follow the standards established for Title VII claims in general. *Griffiths v. CIGNA*, 988 F.2d 457, 468 (3rd Cir.1993), *cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993), and clarified on other grounds, *Miller v. CIGNA Corp.*, 47 F.3d 586, 596 (3rd Cir.1995).

While the prohibitions against retaliatory discrimination protect activities ranging from the filing of a formal complaint to expressing a belief that the employer has engaged in discriminatory practices, informal activities outside Title VII's established procedures are not necessarily entitled to federal protection. *Bray v. Tenax Corp.*, 905 F.Supp. 324, 328 (E.D.N.C.1995); *Cobb v. Anheuser Busch, Inc.*, 793 F.Supp. 1457, 1489–90 (E.D.Mo.1990). To establish that activity is protected under Title VII, a plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed. *Id.*

It has been recognized that direct evidence of retaliation is seldom available and is particularly rare in establishing a causal nexus. Thus, the causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. *Jalil, supra*. Where there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference. *See: Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3rd Cir.1993). Of course, these are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference. *Kachmar, supra*. A causal relationship nevertheless requires more than mere coincidence. Causation requires that the employer's action be the consequence of the protected activities and of nothing else. *Bray, supra*, at 328.

In reviewing the record in this case in conjunction with the preceding principles, we note that the only evidence that plaintiff's discharge was retaliatory comes from the plaintiff himself. Specifically, Plaintiff testified that when he met with Dr. Levy in late March, 1993 to discuss his test scores, he told Dr. Levy that he was concerned that Levy was giving preferential treatment to white residents by approving whatever vacation and time off they wanted thereby making other residents such as himself cover for them. (Defendant's Exhibit "A," 111–112). Plaintiff also told Dr. Levy that he believed he was treating the black residents as though they did not count and that in response to these complaints, Dr. Levy replied only that he was "just doing his job." (Defendant's Exhibit "A," 111–112).

Plaintiff further testified that in April, 1993, he told Dr. Yeh about his perception that Dr. Levy was giving preferential treatment to the white residents and that Dr. Yeh

responded by advising plaintiff that he had to be careful about Dr. Levy as Dr. Yeh could see that Dr. Levy did not want plaintiff in the program. (Defendant's Exhibit "A," 114–115).

Finally, Dr. Neumann testified that in late 1992, Dr. Momah told him he believed the criticisms leveled against him from the nurses, other residents and attendings at Chestnut Hill Hospital during his October–December, 1992 rotation were racially motivated. (Defendants' Exhibit "J," 28, 73–75). Dr. Neumann did not inform Dr. Levy, Dr. Yeh or anyone else at Einstein of Dr. Momah's allegations. (Defendants' Exhibit "J," 76–77) Although both Drs. Levy and Yeh acknowledged that Plaintiff had complained to them about several of the other residents, they did not remember that plaintiff's complaint involved a claim of racial discrimination. (Plaintiff's Exhibit 26, 173–177; Plaintiff's Exhibit 27, 79–86).

There is thus no evidence that plaintiff participated in any specifically protected activity or proceedings under Title VII or the PHRA. In consideration of the standards for entry of summary judgment, however, plaintiff is given the benefit of the doubt that his complaints about Dr. Levy's alleged preferential treatment of white residents constituted protected activity. As there is no question that plaintiff was terminated on August 24, 1993 and since plaintiff's Exhibits 3, 5, 7–15, 21–44 reflect that the criticisms of plaintiff did not begin in earnest until June, 1993, we find that plaintiff has made out a prima facie case of retaliatory discharge.

We therefore next apply the same shifting burden-of-proof analysis as before. *See: Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3rd Cir.1986); *Harley v. McCoach,* 928 F.Supp. 533, 541 (E.D.Pa. 1996). For the same reasons as are articulated above, we reach the same conclusions. As defendants have rebutted the inference of discrimination created by the existence of a prima facie case and since plaintiff has no other evidence other than that outlined in the first section of this Memorandum to demonstrate by a preponderance of the evidence that the reasons offered by defendants are unworthy of credence and are a pretext for

discrimination, summary judgment shall also be entered as to Counts II and VII of the amended complaint.

### 3. Plaintiff's Claims under 42 U.S.C. § 1981

In Count III of his amended complaint, Dr. Momah again contends that he was treated differently and less favorably than other residents who were outside his protected race and national origin categories and that his race and national origin was a determining factor in his eventual termination in violation of 42 U.S.C. § 1981.

Section 1981 declares in relevant part that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

42 U.S.C. § 1981(a).

While § 1981 forbids intentional discrimination based upon race in the making and enforcement of contracts, it can encompass other broader conduct based upon racial discrimination. *Boykin v. Bloomsburg University of Pennsylvania,* 893 F.Supp. 378, 394 (M.D.Pa.1995). Liability under § 1981 is personal in nature and cannot be imposed vicariously; thus personal involvement of a defendant is essential. *Id.,* citing, *inter alia, Jett v. Dallas Independent School District,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2722–23, 105 L.Ed.2d 598 (1989).

Generally, the legal elements of a Section 1981 claim are identical to those under Title VII. *Anderson v. Douglas & Lomason, Co., Inc.,* 26 F.3d 1277, 1284, n. 7 (5th Cir.1994), *cert. denied,* 513 U.S. 1149, 115 S.Ct. 1099, 130 L.Ed.2d 1066 (1995). As a result, analysis under one theory is usually determinative of the other claim. *Johnson v. Resources for Human Development,* 878 F.Supp. 35, 37 (E.D.Pa.1995), aff'd. 77 F.3d

462 (3rd Cir.1996); *Washington v. Brown & Williamson Tobacco Corp.* 756 F.Supp. 1547, 1555 (M.D.Ga.1991), aff'd, 959 F.2d 1566 (11th Cir.1992). As in Title VII cases, plaintiff must prove discriminatory intent to establish a claim under § 1981 and this may be accomplished by showing disparate impact, a history of discriminatory actions and other relevant facts. *Flagg v. Control Data,* 806 F.Supp. 1218, 1223 (E.D.Pa.1992), citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1977). Conclusory allegations of generalized racial bias do not establish discriminatory intent. *Id.*

In lieu of re-stating the analysis outlined above and for the same reasons set forth with regard to plaintiff's Title VII and PHRA claims, we reach the same conclusion. Although plaintiff has made out a prima facie case of racial/national origin discrimination, there is no basis upon which a jury could find that the reasons advanced by defendants for plaintiff's termination are a pretext for discrimination. Summary judgment shall therefore be entered in defendants' favor on Count III of the Amended Complaint.

### 4. *Plaintiff's State Law Claim for Defamation*

Additionally, at Count IV, Dr. Momah asserts that Defendants defamed him by communicating false statements that tended to harm his reputation and lower him in the estimation of the medical community.

■ In an action for defamation, the plaintiff must prove: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm to the plaintiff; and (7) abuse of a conditionally privileged occasion. *Miketic v. Baron,* 450 Pa.Super. 91, 675 A.2d 324, 327 (1996); *Furillo v. Dana Corp. Parish Div.,* 866 F.Supp. 842, 847 (E.D.Pa.1994); 42 Pa.C.S.A. § 8343. When relevant to the defense, the defendant has the burden of proving (1) the truth of the defamatory communication; (2) the privileged character of the occasion; and

(3) the character of the subject matter of defamatory comment as of public concern. *Miketic,* 675 A.2d at 327 citing *Elia v. Erie Ins. Exchange,* 430 Pa.Super. 384, 390, 634 A.2d 657, 660 (1993).

■ In Pennsylvania, a statement is defamatory if it tends to harm an individual's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. *12th Street Gym, Inc. v. General Star Indem. Co.,* 93 F.3d 1158, 1163 (3rd Cir.1996). It is the court which makes the initial determination of whether the statement at issue is capable of defamatory meaning. *Id.,* citing *U.S. Healthcare v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3rd Cir.1990) and *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971). A critical factor in determining whether a communication is capable of defamatory meaning is the nature of the audience hearing the remarks. *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (1987)

■ Generally, an opinion is not actionable as defamatory, although there are exceptions to this general principle such as where there are certain undisclosed defamatory facts to justify the opinion. *Id.; Fort Washington Resources v. Tannen,* 846 F.Supp. 354, 365 (E.D.Pa.1994). Additionally, if the underlying facts are false, the opinion is not protected. *Simms v. Exeter Architectural Products,* 916 F.Supp. 432, 437 (M.D.Pa.1996). Whether the statement or writing constitutes fact or opinion is a question of law for the court to determine. *Id.,* citing *Elia, supra,* 430 Pa.Super. at 390, 634 A.2d at 657.

■ In addition, liability for publication of a defamatory matter may be defeated by a privilege to publish it. *Furillo v. Dana Corp. Parish Div.,* 866 F.Supp. at 847. For example, an employer has an absolute privilege to publish defamatory matters in notices of employee termination and thus publication communicated to a plaintiff and relevant supervisory personnel is not capable of defamatory meaning. *Id.,* citing *Sobel v. Wingard,* 366 Pa.Super. 482, 531 A.2d 520 (1987); *De-*

*Luca v. Reader*, 227 Pa.Super. 392, 323 A.2d 309 (1974). Employers thus have a right of absolute privilege to issue warning letters, notices of termination, etc. with impunity under Pennsylvania law. The privilege is lost, however, if the information is disseminated beyond the circle of those who reasonably need to know the reason for the employee's dismissal. *Smyth v. Barnes*, 1995 WL 576935 (M.D.Pa.1995), citing, *inter alia, Doe v. Kohn, Nast & Graf, P.C.*, 862 F.Supp. 1310, 1327 (E.D.Pa.1994); *Daywalt v. Montgomery Hospital*, 393 Pa.Super. 118, 573 A.2d 1116, 1118 (1990).

■ Conditional privileges arise when the communication involves an interest of the publisher, the recipient, a third party or the public and corporations and directors have been allowed to claim conditional privilege under these circumstances. *Simms v. Exeter Architectural Products, supra*, at 436. Once a defendant has shown that a particular communication is conditionally privileged, the burden shifts to the plaintiff to show an abuse of that privilege. *Guardian Life Ins. v. American Guardian Life Assurance Co.*, 943 F.Supp. 509, 526 (E.D.Pa.1996). Abuse is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege. *Miketic v. Baron, supra*, 675 A.2d at 329; *Beckman v. Dunn*, 276 Pa.Super. 527, 536, 419 A.2d 583, 588 (1980).

In his brief in opposition to defendants' motion for summary judgment, plaintiff points to four communications as the basis for his defamation claim: (1) a memorandum from Dr. Levy to the attending physicians in AEMC's Ob/Gyn Department which alleges that plaintiff exhibits poor clinical judgment and did not know his limitations; (2) a letter from a Dr. Hewlett to Dr. Levy in which Dr. Hewlett stated that plaintiff failed to respond to pages and did not adequately and promptly treat a patient; (3) a letter from a Dr. Leinweber to Dr. Yeh in which Dr. Leinweber accuses plaintiff of intentionally delaying treatment of a patient to avoid responsibility for that patient's care; and (4) a letter from Dr. Yeh to Dr. Leinweber which stated that plaintiff had been terminated from his residency due to multiple patient care issues and personality problems. (Plaintiff's Exhibits 34, 38, 39; Plaintiff's Brief in Opposition to Motion for Summary Judgment, pp. 29–31).

■ At the outset, we observe that neither Dr. Leinweber nor Dr. Hewlett are defendants in this action. As plaintiff neither avers nor provides any evidence that Drs. Levy and Yeh did anything other than merely receive these letters, we find no basis to hold them liable for defamation as to those communications. In like fashion, as there is no evidence on this record to suggest that Drs. Leinweber or Hewlett were acting on behalf of Old York Road Ob/Gyn Associates when they sent those letters to Dr. Yeh, there is no basis upon which to hold this defendant liable, either. (See: Amended Complaint, ¶ s8, 25, 62–65; Defendants' Exhibit "H").

■ Similarly, we do not find that the remaining statements of which plaintiff complains are such as to lower him in the estimation of the community or deter third persons from associating or dealing with him, particularly in view of the audience to whom they were communicated—attending physicians in Einstein's ob/gyn department. As plaintiff further produces no evidence that defendants published these intra-department communications to anyone outside the hospital, it further appears that they would be protected by conditional privilege.

■ Plaintiff does attach as exhibits in opposition to defendants' motion numerous letters from the Southern Maryland Hospital Center and the Maryland Board of Physician Quality Assurance to AEMC and Dr. Yeh, in particular requesting information concerning plaintiff's residency. Plaintiff has produced only one letter from Dr. Yeh in response to these inquiries in which Dr. Yeh states that Dr. Momah was a resident at Einstein in Obstetrics and Gynecology from July 1, 1992 through August 24, 1993 and that "[u]nder the rules of the Graduate Medical Education committee this matter is still pending final review." (Plaintiff's Exhibits 2, 20). Again,

we find nothing of a defamatory nature in this publication.

■ Finally, according to plaintiff's own deposition testimony, he applied for application to residency programs at, *inter alia*, Greater Baltimore Medical Center, Johns Hopkins University Hospital, Jersey City Medical Center, Southern Maryland Medical Center, Catholic Medical Center, University of California at Davis Medical Center and Howard University but that after each of these institutions spoke with Dr. Yeh, his applications went no farther. According to plaintiff, Dr. Yeh gave "negative verbal recommendations." (Defendants' Exhibit "A," 125–139). Again, we cannot find that these statements are defamatory. *See, e.g.: Cashdollar v. Mercy Hospital,* 406 Pa.Super. 606, 617, 595 A.2d 70, 75 (1991).

Moreover, even accepting plaintiff's own deposition testimony as true, we find that plaintiff's prospective employers fall within that circle of those who reasonably need to know the reason for plaintiff's dismissal such that Dr. Yeh's remarks are arguably both absolutely and conditionally privileged. As there is no evidence that Dr. Yeh made these statements maliciously or negligently or for an improper purpose, defendants' motion for summary judgment shall be granted as to Count IV as well.

### 5. *Plaintiff's Claim for Breach of Contract*

■ Finally, at Count V of his amended complaint, Dr. Momah contends that defendants violated the terms of his employment contract in terminating him on August 24, 1993. As the evidence of record directly contradicts plaintiff's claim, summary judgment on this count will be entered as well.

■ To make out a cause of action for breach of contract, a plaintiff must prove 1) the formation of a contract, 2) the terms of that contract, 3) performance by the plaintiff, 4) breach by the defendant and 5) damages. *General State Authority v. Coleman Cable & Wire Company,* 27 Pa.Cmwlth. 385, 365 A.2d 1347 (1976); *Slotsky v. Roffman Miller Assoc., Inc.,* 1995 WL 612592 (E.D.Pa.1995).

Plaintiff claims that defendants breached the employment contract which he had with

AEMC in terminating him without good cause and in not affording him the opportunity to appeal his termination to an Institutional Fair Hearing Committee. (Amended Complaint, ¶s 67–69; Plaintiff's Brief in Opposition to Motion for Summary Judgment, pp. 33–37).

Plaintiff's employment contract provides, in relevant part:

I understand that as a House Officer I must responsibly adhere to the policies and practices of the Medical Center; develop a personal program of diligent self study with guidance from the teaching staff of the Medical Center; participate in the educational activities of my program and assume responsibility as directed for teaching and supervising others: residents and students; participate, under supervision of the training staff, in patient care activities commensurate with my level of training; deliver quality patient care in a safe, compassionate, and cost-effective manner; and participate in Medical Staff programs and activities. My duties will be specified by the Chairman of my Department and/or my Program Director. A schedule of assignments will be provided to me by the Program Director or the Director's designee.

. . . . .

I understand and agree that appropriate action, including termination of my training program, may take place at any time prior to the completion of the above-stated time period, if such action, including termination, is determined by the Chairman of my Department to be either in my best interest or in the best interest of the Medical Center. I will be given an opportunity to appeal such determination through the "Fair Hearing Procedure for House Staff" which upon my request will be made available to me from the Office of Academic and Alumni Affairs.

The record in this case is replete with evidence that Dr. Momah was terminated from his residency for his repeated refusal to follow directions and orders from his supervisors and attending physicians, his repeated failures to report to rounds on time, to be

prepared for presentations, to respond when paged, for failing to complete medical records on time and for various deficiencies in patient care. (Plaintiff's Exhibits 3, 5, 7–11, 14, 19, 21–44; Defendant's Exhibits C–F, J). Only plaintiff himself has testified otherwise. (Defendants' Exhibit "A").[4]

However, even accepting plaintiff's version of events as true and assuming for purposes of this motion that plaintiff performed his duties under the employment contract, the evidence in this matter is clear that he **was** afforded appropriate fair hearings following his termination. (Plaintiff's Exhibits 3–6, 7, 12, 24–27; Defendant's Exhibits A, C–F). While it is certainly understandable that plaintiff is displeased with the outcome of these fair hearings and the decision of the fair hearing committee to uphold his termination, there simply is no evidence that his employment contract was breached. Judgment as a matter of law shall therefore be entered in favor of defendants on this claim also.

### CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment shall be granted in its entirety and judgment entered as a matter of law in favor of all of the defendants and against plaintiff.

An appropriate order follows.

### ORDER

AND NOW, this 7th day of October, 1997, upon consideration of Defendants' Motion for Summary Judgment and Plaintiff's Response thereto and for the reasons set forth in the preceding Memorandum, it is hereby ORDERED that the Motion is GRANTED and Judgment is hereby entered in favor of Defendants, Albert Einstein Medical Center, Sze–Ya Yeh, M.D., Jeffrey Levy, M.D. and Old York Road Ob/Gyn Associates as a matter of law.

---

4. As previously noted, Plaintiff also attaches an Affidavit from one Carol Thomas, the secretary to one of the doctors in the hospital's Ob/Gyn department in opposition to defendants' summary judgment motion. As to plaintiff's job performance, however, Ms. Thomas states only that she observed his interpersonal behavior and found him to be very polite and dedicated to his work.